Edith R. Craig v. Commissioner.
Craig v. Commissioner
Docket No. 10937.
United States Tax Court
1949 Tax Ct. Memo LEXIS 23; 8 T.C.M. (CCH) 1019; T.C.M. (RIA) 49276; November 30, 1949
*23 The fair market value of that portion of petitioner's oil royalty interest which she transferred in trust as gifts on April 20, 1938 and December 30, 1942 determined for gift tax purposes. H. B. Thompson, Esq., for petitioner. H. Arlo Melville, Esq., for the respondent. ARNOLD Memorandum Findings of Fact and Opinion ARNOLD, Judge: This case involves gift tax deficiencies for the calendar years 1942 and 1943 in the respective amounts of $8,785.82 and $215.63. The respondent determined that the fair market value of petitioner's gifts exceeded the values reported by her for 1942 and for the previous year of 1938, and petitioner has joined issue thereon. The parties stipulated that no adjustment was made in petitioner's 1943 gift tax return, except for the total amount of net gifts for preceding years, and that petitioner's gift tax liability for 1943 can be computed under Rule 50 in accordance with this Court's determination of the issues involved in redetermining petitioner's gift tax liability for 1942. Findings of Fact The stipulation of facts filed at the hearing is incorporated herein by reference. Petitioner resides in Long Beach, California. She *24 filed gift tax returns with the collector of internal revenue for the Sixth District of California, Los Angeles, California. During 1936, and for many years prior thereto, petitioner was the fee owner of a tract of land, consisting of 13.3945 acres, in the harbor area of Long Beach, California. This land was her separate property, and will sometimes hereinafter be referred to as the Craig "A" property or the "A" property. To the east of the Craig "A" property lay two other tracts of land, owned by the Craig Shipbuilding Company, which will sometimes hereinafter be referred to as the Craig "B" property and the Craig "C" property, respectively. On December 11, 1936, the petitioner, as lessor, entered into an oil and gas lease whereby the Craig "A" property was leased to The Hancock Oil Company of California. This lease, which will sometimes hereinafter be referred to as the "A" lease, ran for a term of 25 years, with an exclusive option in favor of the lessee to renew for a period of 10 years upon a guaranteed minimum royalty. At the same time the lessee leased from Craig Shipbuilding Company the Craig "B" and Craig "C" properties which will hereinafter be referred to as the "B" *25 lease and the "C" lease, respectively. The lessee was required to commence drilling operations on one of the three leases within five years, or within seven years if it paid $10,000 and deferred drilling for two more years, unless to protect the three parcels it was required sooner to drill offset wells. The parties recognized at the time the lease was executed that drilling was prohibited upon all the parcels by ordinance and unless lawful drilling was permitted within seven years the lease terminated and with it all rights of the lessee except that the lessee could upon its own responsibility and assumption of liability drill within said time. Locations for the first four wells to be drilled on the "A" property were specified on a man annexed to the lease. Once drilling was commenced the lessee was required to work with reasonable diligence until the well was completed or abandoned. Thereafter, and regardless of results, the lessee was required to commence the drilling of the next well within 100 days and continue so to do until there were completed on the "A" property a total of three wells producing oil in commercially paying quantities, including offset wells. The lessee, however, *26 could drill as many additional wells as it desired, so long as the well was 25 feet away from any buildings or structures then on the property. The "A" lease provided for royalties as follows: "Oil royalties: "(a) On all wells having a daily production of less than 1,000 barrels of oil, a one-sixth (1/6) royalty. "(b) On all wells having a daily production of 1,000 barrels and less than 2,000 barrels of oil, a one-fifth (1/5) royalty. "(c) On all wells having a daily production of 2,000 barrels or more of oil, a (1/4) royalty. "(d) The daily production of oil shall be determined by dividing the net total barrels of oil of 42 gallons each, produced from each well for the calendar month by the days in said month during which said well is in operation. "Gas royalties: "On oil well producing gas, same royalty as is paid on the oil from the well producing the gas, not less in any event than a one-sixth (1/6) part of the net proceeds from the sale of such gas. "On wells which failed to produce oil, but produced gas in paying quantities, a one-fifth (1/5) royalty. "Casighead gasoline royalties: "The same royalty as paid for oil produced from well, and in any event *27 not less than one-sixth (1/6) of the net proceeds. "Royalties on other substances: "On all other substance taken or saved and on all substances fabricated therefrom the same royalties as on oil, if possible, and if not, a one-sixth (1/6) royalty." At the time the "A" lease was entered into the existence of the Wilmington Oil Field had been established. Terminal Well No. 1, which started producing from the Terminal zone during June, 1936, was located about a mile and a half west of the Craig "A" property. This well produced 4,000 or 5,000 barrels of oil per day. This production accelerated development in the Wilmington Field. By February 14, 1938, the westerly portion of the field had over 150 producing wells and the harbor area, in which the Craig "A" property was located, had 16 producing oil wells and 20 wells being drilled. On the latter date the "A" lease had one producing well, with an initial production of 4,000 barrels per day, one well drilling, one rig in place for drilling, and two locations for wells. By April 20, 1938, the lessee had completed four wells on the "A" lease, a fifth was nearing completion and a sixth was projected on which drilling actually started *28 April 27, 1938. The initial production of these four wells, which produced from the Terminal zone only, was 17,945 barrels per day. On April 20, 1938 there were 54 wells in operation in the harbor area, including the four on the "A" property. Geologically the Wilmington Field is divided by eight faults that run north and south. The areas bounded on either side by faults are called blocks. The Craig "A" property is located in Block IV. The known oil zones or sands in Block IV at April 20, 1938, with their depths below the surface and their approximate thickness, in order of penetration, were as follows: Zones
Depth
Thickness
Tar Zone
2,400 to 2,500 feet
200 feet
Ranger Zone
2,600 to 3,000 feet
400 feet
Terminal Zone
3,000 to 4,000 feet
1,000 feet Elsewhere in the Wilmington Field the Ford Zone was known to exist at 4,800 to 5,400 feet but it was not known to be under the "A" property at April 20, 1938. The oil sands underlying the "A" property extend southward under the ocean at least 5,000 feet from Water Street, the southern boundary of the "A" property. The apex or dome of the oil structure was about 1,200 to 1,800 feet south of the Craig "A" property. *29 The ocean's shore line was about 600 feet south of Water Street and wells along this shore line were expected to be among the most productive in the harbor area. Assuming no interference from subsequently drilled wells, geologists estimated in May, 1938, that wells located on town lots just north of the shore line would produce over 1,000,000 barrels of oil per well if drainage of oil from the south continued without interruption by offsetting wells. The Board of Harbor Commissioners of Long Beach were formulating plans in April, 1938 for the over-all development of the harbor area which included the drilling of offset wells. Subsequent to April 20, 1938, offset wells were drilled along the shore line and elsewhere. Other wells were whipstocked or directionally drilled along the ocean front and under the entrance channel and channel 3, which formed the western and northern boundaries, respectively, of the "A" property. The Harbor Board authorized the drilling of the latter wells to keep the channel areas from being drained of oil by wells on the adjacent property, including wells on the "A" lease. The rapid development of the Wilmington Field, plus the production of other California *30 oil fields, resulted in more oil than could be disposed of or stored. To relieve this condition a system of voluntary curtailment of oil production was attempted. By February 14, 1938, many of the wells in the western portion of the Wilmington Field were being operated under an agreement by producers to curtail their production. One curtailment plan provided for a 25 per cent reduction in production. A second plan, unrelated to the other, was by a State Conservation Committee which attempted to control production through a so-called Oil Umpire of California. The two plans to curtail production did not include all the wells in the westerly portion of the Wilmington Field at April 20, 1938, and even where operators were ordered or agreed to curtail production compliance therewith did not always follow. The curtailment program had not reached the harbor area by April 20, 1938, but it was generally recognized that some curtailment of production would have to be made in view of the rapid development occurring in that area. The Craig "A" property was located in a so-called town lot area. In such an area the maximum spacing permitted by law was one well per acre in the absence of some special *31 concession or dispensation. At April 30, 1938, the well spacing on the "A" property was one well for each two and a fraction acres. Subsequent thereto, and prior to December 30, 1942, the lessee had 12 wells on the "A" lease. The additional wells permitted the lessee to increase the recovery of oil per acre but reduced the recovery per well. Increased recoveries of oil per acre also resulted from the multiple zone completion wells, which produced from more than one of the oil zones penetrated. The "A" lease had multiple producing wells in the Upper and Lower Terminal Zone, but none producing from both the Terminal and the Ranger Zones. On March 12, 1938, the petitioner created five separate trusts as follows: Relationship
of Beneficiary
Name of Trust
to Petitioner
(1) Ruth Craig Merrell Trust
Daughter
(2) John Craig II Trust
Son
(3) Ann V. Craig Trust
Daughter
(4) George L. Craig II Trust
Son
(5) James G. Craig Trust
Son The three sons of the petitioner were trustees of each of the trusts. On April 20, 1938, the petitioner, by five separate gifts, conveyed to each of the abovedescribed trusts an eight per cent interest in the mineral rights in the *32 property, subject to the lease in favor of The Hancock Oil Company of California. The instruments of transfer were identical with the exception of the names of the donees. On March 15, 1939, petitioner filed a Federal gift tax return on Form 709 with the collector of internal revenue for the Sixth District of California, reporting the amount of gifts for the year 1938 in the sum of $151,544.15. (This figure represents amount of gifts less five $5,000 exclusions.) After claiming the specific exemption of $40,000, the net gifts for the year were reported at $111,544.15. Tax in the amount of $8,671.88 was reported and paid. No field examination was made of the petitioner's gift tax return for 1938; the return was accepted as filed; and no deficiency in gift tax was asserted, nor is a deficiency now being asserted against the petitioner for that year. On March 15, 1940, petitioner and The Hancock Oil Company entered into an agreement amending and supplementing the original lease, dated December 11, 1936. The amending instrument acknowledged that the lessee had performed its minimum drilling requirements under the original lease by drilling and placing the six wells (A-1 to A-5, inclusive, *33 and A-14) in production, and that the lessee was under no further obligation to drill offset wells "except as to deeper sands than those from which the said six (6) wells are now producing, * * *." The amending instrument recites that Hancock, with petitioner's consent, had drilled three additional wells (A-21, A-22 and A-23), which wells had not been previously authorized, and that petitioner authorized Hancock to drill not more than three more wells to be designated as A-15, A-19, and A-27, one of which, A-15, was to be whipstocked or directionally drilled. Royalties payable to petitioner as to all wells except A-15 were to be 16 2/3 per cent for the first eight months of settled production and 20 per cent thereafter, so long as the well flowed naturally, of all oil, gas, casinghead gasoline and other substances produced from each well. After the well ceased to flow naturally the royalty was 16 2/3 per cent. The royalty payable to petitioner on all oil, gas, casinghead gasoline and other substances as to Well A-15 was 16 2/3 per cent for the first ten months of settled production, 20 per cent thereafter so long as the well flowed naturally, and 16 2/3 per cent when the well ceased *34 to flow naturally. It was also agreed that in determining the percentages of royalty payable in respect of each of the additional wells each well and each producing zone of each well should be considered individually. By December 30, 1942, the lessee had drilled the following wells which were producing from the zones and for the periods indicated: December 11, 1936 to April 20, 1938
Zone or Zones from
Well Number
Which Produced
A-1
Upper and Lower Terminal
A-2
Upper and Lower Terminal
A-3
Upper and Lower Terminal
A-4
Upper and Lower Terminal
A-5
Upper and Lower Terminal
A-14
Lower Terminal
April 21, 1938 to December 30, 1942
A-15
Lower Terminal
A-19
Upper Terminal
A-21
Lower Terminal
A-22
Lower Terminal
A-23
Upper and Lower Terminal
A-27
Lower Terminal
Oil flowed naturally from each of the above-mentioned wells from their inception to December 31, 1942, except for Well A-5, which started pumping during October, 1942. The annual and total production of these wells on the "A" lease in barrels of oil through December 31, 1942, was as follows: 1938
1939
1940
1941
1942
Total
A-1
293,587
95,920
67,241
71,372
58,734
586,854
A-2
235,327
95,921
67,243
71,370
58,956
528,817
A-3
185,254
95,919
61,062
Shut in
56,882
399,117
A-4
104,500
92,424
67,244
71,368
59,258
394,794
A-5
166,092
95,918
48,519
Shut in
55,494
366,023
A-14
128,983
95,916
54,701
71,366
56,666
407,632
A-15
52,956
71,365
55,914
180,235
A-19
12,892
Shut in
55,300
68,192
A-21
36,939
67,243
71,364
53,257
228,803
A-22
22,688
67,245
71,364
53,002
214,299
A-23
25,790
67,244
71,364
53,657
218,055
A-27
45,775
71,364
54,189
171,328
Total
1,113,743
657,435
679,365
642,297
671,309
3,764.149
*35 Crude oil prices at the well in the Wilmington Field from October 15, 1937, to January 31, 1940, ranged from $0.75 per barrel to $1.21 per barrel, depending upon the specific gravity of the oil. From May 23, 1941, to March 31, 1943, crude oil prices offered at the well ranged from $0.68 to $1.24 per barrel. The following summary shows total production from the "A" lease by "well-days" per year from the beginning of production through December 31, 1942: Barrels
Barrels
Days
Per
Year
Produced
Producing *
Well-Day
1938
1,113,743
1,665
668.91
1939
657,435
2,544
258.43
1940
679,365
3,658
185.72
1941
642,297
3,285
195.52
1942
671,309
4,315
155.58
Royalty payments were made to royalty owners under the Craig "A" lease through December 31, 1942, as follows: John Craig II,
James G. Craig,
and George L.
Craig II, Joint
Year
Edith R. Craig
Tenants
1938
$189,995.97
$ 53,969.35
1939
67,536.51
45,024.15
1940
72,710.72
48,474.00
1941
82,741.38
55,160.84
1942
87,607.40
58,404.87
Total
$500,591.98
$261,033.21
*36 There were no sales of oil royalty interests involving lands in the Wilmington Field and very few sales of oil royalty interests anywhere in southern California prior to December 31, 1942. On December 30, 1942, the petitioner, by five separate gifts of present interests, conveyed to each of the five trusts hereinabove named a two (2) per cent interest in the mineral rights in the property, subject to the lease in favor of The Hancock Oil Company of California. The instruments of transfer were identical with the exception of the names of the donees and, with the exception of the percentage amounts, were the same as the instruments employed to transfer the eight (8) per cent interests in 1938, hereinabove mentioned. On March 15, 1943, the petitioner filed a Federal gift tax return on Form 709 with the collector of internal revenue for the Sixth District of California, on which she reported the value of each of the gifts made on December 30, 1942, at $7,110.32 or a total for the five gifts of $35,551.60. No deductions were claimed and a tax of $7,999.11 was reported and paid. On December 22, 1943, the petitioner made outright gifts (not in trust) to her five children, for whom *37 the aforementioned trusts were created. Each gift consisted of an undivided one-fifth (1/5) interest in a life insurance policy in the face amount of $100,000 with the Prudential Life Insurance Company of America, in which John F. Craig, husband of the petitioner, is insured. The value of each of said gifts was reported at $10,560.90, or a total for the five gifts of $52,804.52. Five exclusions of $3,000 each were claimed, or a total of $15,000, making the net gifts for the year amount to $37,804.52. A tax in the amount of $8,506.02 was reported and paid. In computing her 1942 and 1943 gift taxes the petitioner reported total net gifts for preceding years on schedule C of Form 709, as follows: 1938
$111,544.15
1942
35,551.60 The respondent, in his deficiency notice, determined (1) that the fair market value of the net gifts made by the petitioner in 1942 was $74,599.69; and (2) that the total amount of net gifts for preceding year (1938) was $141,971.13, instead of $111,544.15, as reported by the petitioner in her 1942 return, and (for 1938 and 1942) was $216,570.82, [1] instead of $147,095.75, as reported by the petitioner in her 1943 return. *38 The amount of lessor's recoverable oil in the Ranger and Terminal zones of the Craig "A" property and the computed fair market value thereof on the basic dates, as estimated by four expert witnesses, are as follows: April 20, 1938
Barrels Recoverable Oil
Fair Market Value
Witness
Ranger
Terminal
Entire Interest
40% Transferred
Cutler
468,807
3,214,680
$440,237.00
$176,094.80
Baxter
2,570,220
3,342,452
517,427.82
206,971.13
Evans
900,000
5,400,000
690,000.00
276,000.00
December 30, 1942
10% Transferred
Stolz
716,760
2,020,000
355,516.00
35,551.60
Evans
1,200,000
4,485,000
626,000.00
62,600.00
Baxter
2,570,220
6,440,256
745,996.86
74,599.69
On April 20, 1938, the fair market value of the 40 per cent royalty interest that petitioner transferred in trust on that date was $176,544.15. On December 30, 1942, the fair market value of the 10 per cent royalty interest that petitioner transferred in trust on that date was $50,000. Opinion The issue to be determined is purely factual. We have fixed the fair market value on the basic dates after carefully weighing the stipulated facts, the documentary *39 evidence and the conflicting opinions of the expert witnesses. Any conclusion as to the amount of recoverable oil on the basic dates must necessarily be an estimate. This record demonstrates how able and experienced men in the industry can take known facts and reach divergent results. In the discussion that follows, we will analyze the opinions and estimates of the expert witnesses, and point out the more material facts that influenced our determinations of value on the basic dates. The value of petitioner's gift on April 20, 1938, has been determined in the light of facts known to exist at that time or reasonably to be anticipated. We have eliminated from consideration all developments subsequent to the basic date. The more important facts known to exist at April 20, 1938, were the following: Most of the producing wells in the Wilmington Field were a mile or more west of "A" lease. Drilling operations on and around "A" lease were increasing as operators sought to determine the size and the extent of the Wilmington Field. Voluntary curtailment of production was in effect in the westerly portion of the Wilmington Field, and it was recognized that a curtailment program would have to *40 be set up in the harbor area due to its rapid development. "A" lease with six wells drilled, drilling, and projected was essentially a town lot area with each well draining an average of slightly over two acres. Offset drilling was planned by the Board of Harbor Commissioners to prevent drainage of oil from under the channels on two sides of "A" lease. Faults east and west of "A" lease were known to exist but their effect, if any, on production was undetermined. Production on "A" lease at the basic date was of such recent duration that an intelligent forecast of future production could not be based thereon. It was upon these principal facts and their own knowledge, skill and experience in the industry that the four experts based their opinions of the recoverable oil in place (landholder's share) and the value thereof at the basic date. While there were three known zones of oil-bearing sands, the experts agreed that only the Ranger and the Terminal were commercially important, and it should be noted here that the only production on "A" lease was from Terminal. Since there has been no production from Ranger, whatever reserves of oil existed on April 20, 1938, still existed on December 30, 1942, our *41 other basic date. Two expert witnesses, Baxter and Cutler, one for each party, testified that the amount of recoverable oil in the Terminal Zone (landholder's share) on April 20, 1938, was approximately the same. Baxter, who testified to the larger estimate in barrels, nevertheless valued Terminal reserves at less than Cutler. The third expert's estimate was more than 2,000,000 barrels in excess of both of the other estimates, and his valuation materially exceeded theirs. The competence and ability of each expert was recognized and conceded by one or more of the other experts, and since there is no logical reason for preferring one expert's opinion over the others, we must judge between them. It is our opinion that the estimated values by the two experts, one for petitioner, the other for respondent, being so nearly in accord, considered in connection with all the other facts and circumstances of record more nearly reflects the April 20, 1938 value for gift tax purposes. The testimony is more contradictory as to Ranger. No two of the experts agreed on the amount of recoverable oil in the Ranger Zone. Baxter's estimate was more than double any other estimate. Evans, respondent's *42 other expert witness, estimated that the landholder's share of 1938 Ranger reserves was about one-third of Baxter's estimate. For the purpose of checking their 1938 estimates and not as proof of or an inference reasonably to be drawn on April 20, 1938, it is interesting to compare the 1942 estimates of the witnesses with the 1938 estimates, no production occurring in the interim. With the intervening experience and production before him Evans raised his 1938 estimate by one-third; Baxter made no change in his estimate. Stolz's estimate was 247,953 barrels in excess of Cutler's 1938 estimate, and is in line with the 300,000 barrel increase testified to by Evans. Weighing these estimates and the other facts and circumstances herein, we believe the landholder's share of recoverable oil in Ranger was approximately 470,000 barrels. We hold therefore that the value of petitioner's gifts on April 20, 1938, was $176,544.15, the amount reported on her 1938 tax return. This determination leaves net gifts for preceding years (1938) the same as that reported by petitioner in her 1942 gift tax return, and the legal question postulated and argued by the parties on brief becomes moot. In like manner *43 we have evaluated the facts and circumstances of record as to the fair market value of the 10 per cent interest transferred in trust by petitioner on December 30, 1942. By the latter date production records were available for the 12 producing wells on "A" property and the witnesses could support their valuations by past experience and the development that had occurred in the Wilmington Field and particularly in the harbor area where the "A" property was located. It is interesting to note that only Baxter estimated that oil reserves on December 30, 1942 exceeded the oil reserves on April 20, 1938. The estimated reserves on December 30, 1942 by Stolz and Evans were considerably below Baxter's estimate. Baxter used a mathematical formula known as the production rate of decline curve method to assist him in his valuation. Stolz used the volumetric formula to assist him and Evans made some use thereof but not to the same extent as Stolz. Both Stolz and Cutler testified that the information was not available to accurately use a production rate of decline curve. Baxter insisted the information was available, that he had devised the formula, and that by the use thereof he had projected production *44 into the future, which aided him in his valuation. We are not persuaded that the valuation of oil properties is susceptible of determination by mathematical formulae. The uncertainties incident to the production of oil are well known in the industry and outside of it. No satisfactory formula has yet been devised for valuing interests in producing wells. And we need go no further than this record to establish that there is disagreement among recognized experts in the oil industry as to the merits of the different formulae for evaluating such interests. We prefer to base our opinion of value upon a careful consideration of all the facts and circumstances, assigning to each of the many factors that must be considered the weight deemed proper in relation to the whole. Our valuation of $50,000 is thus a composite of all known factors at December 30, 1942 including prospects reasonably anticipated on that date based on existing facts. Considerable evidence was offered of facts occurring subsequent to December 30, 1942, such as production of wells, additional drillings, a further amendment to the lease indenture, etc. We have omitted these facts from our findings because our valuations *45 must be made as of the basic dates upon facts then known to exist or reasonably anticipated. Subsequent production and the drilling of new wells, or the deepening of wells to new oil zones not known to exist on "A" property at the basic date, can be given but little, if any, weight. It would complete the picture to date, but it is the picture at December 30, 1942, that must be viewed, and the value at that time which must be determined. In our opinion these subsequent facts would, at most, be merely corroborative of the value we have determined at December 30, 1942, and they are not required as findings in order to reach our present conclusion. Decision will be entered under Rule 50. Footnotes
*. Represents "well-days," i.e., actual production from the well for each 24-hour day.↩
1. Stipulated to be $226,570.82 by the parties; but deficiency notice and our addition of net gifts for 1938 and 1942 show respondent determined total net gifts to be $216,570.82.↩